ORIGINAL

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------X<br>FIFTH STREET FINANCE CORP.,<br><br>                Plaintiff,<br><br>   - against -<br><br>BRUCE TOLL,<br><br>                Defendant.<br>------------------------------------------------------------X | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC#<br>DATE FILED: 7/17/13<br><br>**OPINION AND ORDER**<br><br>12 Civ. 5896 (ER) |

Plaintiff Fifth Street Finance Corp. ("Fifth Street Finance" or the "Company") commenced this action against Defendant Bruce Toll ("Toll") on June 22, 2012, alleging tortious interference with prospective economic advantage. Doc. 1. Plaintiff essentially argues that Toll interfered with its business dealings with Bank of America ("BOA"). Now pending is Defendant's motion to dismiss Plaintiff's sole claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 17. For the reasons discussed below, Defendant's motion to dismiss is GRANTED.

I.    **Background**[1]

Plaintiff Fifth Street Finance is a financial investment company managed by Leonard M. Tannenbaum ("Tannenbaum"). Compl. ¶ 8.[2] Defendant Toll is a wealthy investor, and Toll's daughter, Elizabeth Toll, was married to Tannenbaum from 1997 to 2010. Id. ¶ 9. During the period that Toll was Tannenbaum's father-in-law, the two men entered into numerous business agreements together. Id. ¶ 10. Among these was a new investment fund called Fifth Street

---

[1] The following facts are taken from the Complaint and are assumed to be true for the purposes of this motion.

[2] The Complaint was filed in the Supreme Court of the State of New York, Westchester County, and was removed to this Court on August 1, 2012. All citations to the Complaint refer to the Verified Complaint attached as Exhibit A to Defendant's Notice of Removal. Doc. 1.

Mezzanine Partners III, L.P., formed in 2007, which became Fifth Street Finance after the company went public with a stock offering in 2008. *Id.* ¶ 12. Toll was a shareholder in Fifth Street Finance and also served on its Board of Directors for a period of time ending in February of 2009. *Id.* ¶¶ 12, 15.

In the summer of 2009, Fifth Street Finance sought to make a second stock offering (the "Offering") with an intended date of issuance in July 2009. *Id.* ¶ 13. Toll expressed his strong disproval of the Offering to Fifth Street Finance and demanded that the Company not go forward with the transaction. *Id.* ¶¶ 4, 15. Toll's objections to the deal were unheeded, and when he demanded that the Company lift the restriction on his stock so that he could sell his shares prior to the Offering, Fifth Street Finance told him that he could not sell his stock because he was in possession of material, non-public information about the Offering. *Id.* ¶¶ 4, 18. Around the same time period, Toll developed a deep animus toward Tannenbaum as a result of the separation in 2009 of Tannenbaum and Elizabeth Toll, which later led to their divorce in 2010. *Id.* ¶ 9. Toll's personal animus toward Tannenbaum and his anger at Fifth Street Finance for ignoring his objection to the Offering caused Toll to retaliate against Fifth Street Finance by "set[ting] about to intentionally sabotage BOA's involvement in the offering, as it was Toll's desire to derail the offering entirely, or severely disrupt the transaction, and inflict damages and hardship on the Company and Tannenbaum." *Id.* ¶ 5.

Fifth Street Finance engaged BOA as one of the underwriters for the issuance. *Id.* ¶ 20. BOA employee Faye Elliot was the analyst on the transaction. *Id.* ¶ 21. Elliot, upon performing due diligence for the deal, indicated to Fifth Street Finance that there were "no problems" and she expected the deal to move forward. *Id.* ¶ 22. On July 9 and 10, 2009, three different BOA committees reviewed the deal. *Id.* ¶ 24. The first two committees approved the transaction, but

"as a direct result of Toll's wrongful interference," the third and most senior committee, the Equity Commitment Committee, did not approve BOA's involvement in the transaction. *Id.* ¶ 31. At the meeting with the third committee, Elliot is alleged to have "dramatically reversed course . . . . indicat[ing] that she had serious reservations about the transaction, including because of Toll's opposition to the Offering and because of certain other information [Elliot] had received relating to Tannenbaum and the Company." *Id.* ¶ 32.

Toll's alleged interference with the transaction involved his "misuse[] [of] his deep and long-standing business relationship with BOA to exert extreme economic pressure on the bank, and thereby compel BOA to abandon its role in underwriting the Offering." *Id.* ¶ 26. Plaintiff also alleges that Toll made "damaging misrepresentations regarding the Company and/or Tannenbaum in communications he had with one or more BOA employees . . . . [which] were intended by Toll to falsely denigrate and disparage the Company and Tannenbaum, in order to further convince BOA to abandon its participation in the Offering." *Id.* ¶ 30. This was later followed up by similar "false and disparaging remarks to employees of other entities with which [Fifth Street Finance] does business . . . ." *Id.* Toll's alleged threats regarding his future business with BOA and alleged disparaging remarks caused the Equity Commitment Committee to decide against underwriting the stock. *Id.* ¶¶ 29, 31.

BOA notified the Company that it could not underwrite the transaction only three days before the Offering; however, Fifth Street Finance was able to retain UBS to provide the financing in their stead. *Id.* ¶¶ 33, 36. The change in banks caused Fifth Street Finance to incur large costs, because UBS was required to perform its due diligence in a matter of days. *Id.* ¶ 36. Additionally, the Offering was postponed for two days, resulting in a decline in the price of Fifth Street Finance's stock. *Id.* ¶ 37. Plaintiff alleges that Toll's conduct also damaged Fifth Street

Finance's future business opportunities with BOA, which is "one of the financial market's largest lending and retail investment systems . . . ." *Id.* ¶ 38. The Company's inability to conduct business with BOA since the summer of 2009 has caused Fifth Street Finance to lose "many millions of dollars in lost profits, costs and business opportunities." *Id.* ¶¶ 1, 38.

## II. Standard of Review for Motion to Dismiss

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all of the factual allegations from the complaint, and draw all reasonable inferences in the plaintiff's favor. *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory statements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face.'" *Id.* (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Rule 8(a) "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. Tortious Interference with Prospective Economic Advantage

### A. Elements of the Claim

To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant

4

acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."[3] *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (citing *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)). Defendant argues that the third element of this claim has not been sufficiently pled. Def.'s Mem. Law Supp. Mot. Dismiss ("Def.'s Mem.") 6, Doc. 19.

To satisfy the third element of tortious interference with prospective economic advantage the Defendant must have acted solely out of malice or have used improper means. *Kirch*, 449 F.3d at 400. Actionable "improper means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y. 2d 614, 624 (1996) (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y. 2d 183, 191 (1980)). However, persuasion alone, even when knowingly directed at a specific business relationship, is not enough. *Id.*

In *Carvel Corporation v. Noonan*, the New York Court of Appeals clarified the required showing to satisfy the third element of a tortious interference claim, in response to a certified question from the Second Circuit.[4] 3 N.Y. 3d 182 (N.Y. 2004) ("*Carvel II*"). The court

---

[3] In *Catskill Dev., L.L.C. v. Park Place Entertainment Corporation*, the Second Circuit noted that "tortious interference with prospective economic advantage" and "tortious interference with business relations" describe the same tort. *Catskill Development, L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (Sotomayor, J.). The Second Circuit defined the third element of such a claim as requiring the plaintiff to plead that "the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means." *Id.* (discussing the "wrongful means requirement" for a tortious interference with business relations claim).

[4] In *Carvel Corporation v. Noonan*, 350 F.3d 6 (2d Cir. 2003), the Second Circuit considered the consolidated appeals from judgments entered on jury verdicts in three separate trials in favor of appellees on their claims of breach of contract, breach of implied covenant of good faith and fair dealing, and intentional interference with prospective economic advantage. The three appellees were former franchisees of the appellant, who alleged that Carvel had unlawfully interfered with the franchisees' customer relationships by implement a "supermarket program" whereby Carvel, *inter alia*, sold ice cream to supermarkets at bargain prices and issued coupons that could only be redeemed at supermarkets. 350 F.3d at 9-13. The Second Circuit was unable to determine whether the appellees had established the third element of their tortious interference claim, because it was unclear what sort of

explained that "as a general rule, a defendant's conduct must amount to a crime or an independent tort," because "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability with interference with prospective contracts or other non-binding economic relations." *Carvel II*, 3 N.Y.3d at 190 (citing *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*, 641 N.Y.2d 614, 624 (N.Y. 1996)). The only exception to the general rule identified by the New York Court of Appeals is when a defendant engages in conduct "for the sole purpose of inflicting intentional harm on [the] plaintiff[]." *Id.* at 190. The court went on to explain that economic pressure is only "wrongful" when it is "extreme and unfair." *Id.* at 192-93. Other courts have interpreted *Carvel II* to mean that economic pressure can satisfy the "wrongful means" requirement only when it is "extreme and unfair," and exerted "for the sole purpose of inflicting intentional harm on [the] plaintiff." *See, e.g., Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 172 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58, 60 (2d Cir. 2009); *see also Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 343-47 (S.D.N.Y. 2008) (discussing *Carvel II* and collecting cases involving allegations of economic pressure).

### B. Discussion

Here, Plaintiff's tortious interference with prospective economic advantage claim is based on two theories: (1) Defendant used improper means, in this case misrepresentations, to

---

conduct constituted "wrongful means." *Id.* at 23. Thus, the Court certified the following question to the New York Court of Appeals:

> Under applicable standards for a claim of tortious interference with prospective economic relations, did the evidence of the franchisor's conduct in each of the three trials on review in these consolidated appeals permit a jury finding in favor of the franchisee? In answering this question, the Court of Appeals might wish to inform us whether, in the context of a tortious interference claim, New York would view the franchisor in this case as a competitor of the franchisees for purposes of determining the applicable standard, and, if so, whether a plaintiff must show that a competitor-defendant acted "wrongfully" but show that a non-competitor defendant acted only "improperly."

*Id.*

convince BOA to decide against underwriting the Offering; and (2) Defendant exerted extreme and unfair economic pressure on BOA.  Compl. ¶¶ 26-30; Pl.'s Mem. Law Opp. Def.'s Mot. Dismiss Pl.'s Compl. ("Pl.'s Mem.") 9, 14, Doc. 20.  The Court will address each theory in turn.

### 1. Plaintiff's Misrepresentation Theory

Plaintiff alleges that Defendant used improper means when Toll made "damaging misrepresentations regarding the Company and/or Tannenbaum in communications with BOA employees."  Complaint ¶ 30.

In addressing this theory, Defendant argues that Rule 9(b)'s heightened pleading standard applies to Plaintiff's tortious interference claim because it is based, in part, on allegations of misrepresentations, and that Plaintiff has not satisfied the more stringent pleading requirements for claims sounding in fraud.  Def.'s Mem. 10-11; Def.'s Reply Supp. Mot. Dismiss Compl. ("Def.'s Reply Mem.") 2-3, Doc. 21.  Defendant goes on to argue, however, that the question of whether Rule 9(b) applies to Plaintiff's claim is purely "academic," because Plaintiff's complaint also fails to satisfy the more liberal pleading standard of Rule 8.[5]  Def.'s Mem. 11.

In opposing the pending motion, Plaintiff argues that the tortious interference claim is only subject to the Rule 8 notice pleading standard, and that the allegations in the Complaint are sufficient to withstand a motion to dismiss because "Plaintiff has narrowed the window to when these conversations took place to June and early July 2009, and noted that the misrepresentations had to be directly made to Ms. Elliot, or eventually passed along to her by someone at BOA with the influence to change her mind."  Pl.'s Mem. 12.

---

[5] Because the Court concludes that Plaintiff's claim fails to satisfy the notice pleading standard set forth in Rule 8, it declines to decide the "academic" question of whether a tortious interference claim based, in part, on allegations of misrepresentations is subject to the heightened pleading standard for fraud claims set forth in Rule 9(b).

While misrepresentations can be the basis for a tortious interference with prospective economic advantage claim, *see, e.g.*, *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 730 (S.D.N.Y. 2012) (citations omitted), the Court must perforce know what the misrepresentations are in order to assess whether the alleged misrepresentations, accepted as true, suffice to state such a claim. Here, the Complaint is bereft of any statement, much less any misrepresentation, that Defendant is alleged to have made to BOA. The Complaint contains no factual allegations describing the substance of the alleged misrepresentations, why they are false, or where, when, or to whom they were made. For example, while Plaintiff alleges that Defendant's misrepresentations were "intended by Toll to falsely denigrate and disparage the Company and Tannenbaum, in order to further convince BOA to abandon its participation in the Offering," Compl. ¶ 30, it provides no detail as to what Toll allegedly said about Tannenbaum or the Company. Similarly, Plaintiff's allegation that the BOA analyst on the transaction, Faye Elliot, "dramatically reversed course . . . because of Toll's opposition to the Offering and because of certain other information she had received relating to Tannenbaum and the Company," *id.* ¶ 32, provides no facts from which the Court can infer that Toll gave Elliot any information that was untrue, or that they even spoke.

To survive a motion to dismiss, the Complaint must contain enough factual matter for the claim to be plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Here, the Complaint is devoid of facts relating to the alleged misrepresentations. The Complaint contains no substance regarding any statement alleged to be a misrepresentation or any statement alleged to be disparaging. Instead, Plaintiff proffers simply a conclusion: Defendant doesn't like me and BOA backed out of the deal; therefore, Defendant *must have* said something disparaging about me in order to induce BOA to back out of the deal. Rule 8(a) requires more. *Iqbal*, 556

U.S. at 678-79 (Rule 8(a) "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Therefore, the Court concludes that even under the more liberal pleading standard of Rule 8, the allegations in the complaint are insufficient to withstand Defendant's motion to dismiss.

### 2. Plaintiff's Extreme Economic Pressure Theory

Plaintiff also alleges that Toll "misused his deep and long-standing business relationship with BOA to exert extreme economic pressure on the bank, and thereby compel BOA to abandon its role in underwriting the Offering," when he "contacted his investment advisor at BOA and used his lucrative relationship with BOA to exert undue influence upon BOA to abandon its role in acting as the underwriter for the Company's Offering." Compl. ¶¶ 26-28. Plaintiff claims that "Toll's business, and the potential business that he could bring to BOA in the future, was extremely valuable to the bank," and alleges, upon information and belief, that when BOA was "confronted with Toll's implicit or explicit threats relating to the relationship with BOA and Toll, BOA was unwilling to go forward with the Offering." Compl. ¶ 29.

Defendant contends that Fifth Street's allegation that Toll threatened to withdraw his money from BOA if it participated in the Offering is insufficient to state a claim for tortious interference with prospective economic advantage, because a threat to take one's business elsewhere does not constitute actionable extreme economic pressure as a matter of law. Def.'s Mem. 12-17; Def.'s Reply Mem. 8-10. In response, Plaintiff argues that Defendant has misinterpreted the allegations relating to the extreme economic pressure aspect of its claim, and asserts that Fifth Street "has not alleged that Toll threatened to take his BOA business elsewhere." Pl.'s Mem. 2, 15-16. Plaintiff goes on to state that "the exact nature of extreme

9

economic pressure Toll place on BOA is almost certain to be a matter of intense actual dispute . . . ." Pl.'s Mem. 16.

Having disclaimed any allegations of economic pressure in the form of implicit or explicit threats by Toll to remove his business from BOA, Plaintiff is left with only general and conclusory allegations of economic pressure, which are wholly inadequate to withstand Defendant's motion to dismiss. The Complaint contains no factual allegations of any type of economic pressure other than the alleged threats that Plaintiff has now explicitly disclaimed. Moreover, Plaintiff does not allege that Toll exerted such economic pressure "for the sole purpose of inflicting intentional injury" on the Company. Finally, the Court finds Plaintiff's inherent assumption that Toll is capable of placing "extreme and unfair" economic pressure on BOA, which Plaintiff describes as "one of the financial market's largest lending and retail investment systems," Compl. ¶ 38, to be simply implausible.

Plaintiff has not adequately pled a tortious interference claim on the basis of either improper means, in the form of misrepresentations, or on the basis of extreme economic pressure. Therefore, Defendant's Motion to Dismiss is GRANTED.

### C.     Leave to Replead

As Plaintiff concedes, at the pre-motion conference before this Court regarding Defendant's proposed motion to dismiss, the Court invited Plaintiff's counsel to file an amended complaint to address the deficiencies identified by Defendant. *See* Pl.'s Mem. 17 n.3. At that time, Plaintiff's counsel told the Court "that under the case law, amendment was not necessary." *Id.* However, in opposing the instant motion, Plaintiff's counsel requests leave to re-plead should the Court decide to grant the pending motion to dismiss. *Id.* at 17 & n.3. Rule 15(a) of the Federal Rules of Civil Procedure provides that the court should grant leave to amend "freely

. . . when justice so requires." Fed. R. Civ. P. 15(a). However, "[w]here amendment would be futile, denial of leave to amend is proper." *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 140 (2d Cir. 2011) (quoting *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006)). Further, "the Second Circuit has repeatedly upheld a district court's decision to deny a plaintiff's informal request to amend its complaint when it failed to advise the district court of how an amendment would cure defects in the complaint." *In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, No. 11 Civ. 4544 (WHP), --- F. Supp. 2d ----, 2012 WL 3293506, at *11 (S.D.N.Y. Aug. 14, 2012) (collecting cases); *see, e.g., Wilson*, 671 F.3d at 140 (affirming district court's denial of leave to amend where the plaintiff "never indicated to the district court how further amendment would permit him to cure the deficiencies in the complaint."). Here, Plaintiff has not offered any indication as to how it might cure the pleading deficiencies by amending the complaint, or submitted a proposed amended complaint. Therefore, Plaintiff's request to amend the Complaint is DENIED.

### IV. Conclusion

For the reasons set forth above, Defendant's motion to dismiss the Complaint is GRANTED. Plaintiff's request for leave to amend the Complaint is DENIED. The Clerk of the Court is respectfully directed to terminate the pending motion, Doc. 17, and to close this case.

It is SO ORDERED.

Dated:   July 17, 2013
         New York, New York

                                                        _____
                                                        Edgardo Ramos, U.S.D.J.